COMMONWEALTH *vs.* JAMES R. JONES
(and a companion case).

Suffolk.     December 2, 1968. — January 7, 1969.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK,
SPIEGEL, & REARDON, JJ.

*Search and Seizure. Evidence,* Competency, Relevancy and materiality, Of identity, Failure to produce witness. *Error,* Whether error harmful. *Burglarious Instruments. Practice, Criminal,* Charge to jury.

In criminal proceedings against two defendants for breaking and entering a dwelling house in the nighttime with intent to steal, where it appeared that police officers arrested the two defendants upon observing them leaving the house and proceeding toward an automobile of one of them, and that within a few minutes after the defendants were arrested and while they were in a nearby police automobile the officers searched the defendant's automobile, it was held that the search without a warrant was valid. [173]
At the trial of indictments for breaking and entering a dwelling house in the nighttime with intent to steal and illegal possession of a firearm, there was no error in admission in evidence of a revolver found in an automobile of an accomplice near the house where, although a verdict

Commonwealth *v.* Jones.

of not guilty was directed on the indictment for illegal possession at the close of the Commonwealth's evidence, the revolver, when admitted in evidence, had been admissible under that indictment and it was unlikely that the jury would have thought it had any bearing under the indictment for breaking and entering. [174–175]

It was within the discretion of the judge at the trial of an indictment to deny a motion by one of the defendants to strike certain testimony having some relevance as showing that that defendant was an acquaintance of a codefendant and had been his companion at the scene of the crime, even if the witness was a parole officer and, although that fact was not stated to the jury, his testimony might have led to speculation whether he had an official relationship with the moving defendant and to a possible inference of a prior offence of that defendant. [175–176]

Where it appeared in a criminal prosecution for possession of burglarious instruments that in the circumstances it was reasonably inferable that the defendants intended to use, for the purpose of a burglarious breaking and entering of a dwelling house, a screwdriver and a kitchen knife found, with gloves, in their possession upon their leaving the house, a verdict of guilty was warranted even though there was evidence that the breaking and entering had been accomplished by means of breaking a pane of glass and there was no evidence that the screwdriver and the knife had been actually used to effect the breaking and entering. [176–177]

On the record of a criminal trial, no reversible error appeared in the charge in that the judge explained to the jury that he had interrupted the argument of counsel for a defendant because counsel was making an improper suggestion that an inference might be drawn from failure of the prosecution to call a certain person as a witness; or in that the judge inadvertently said that no "unreasonable" inference could be drawn from a certain fact instead of saying that no "unfavorable" inference could be drawn therefrom; or in that the judge used an illustration of how inferences might be drawn from circumstantial evidence. [177–178]

FIVE INDICTMENTS found and returned on May 5, 1967.

The cases were tried in the Superior Court before *Tomasello,* J.

*Reuben Goodman* for the defendants.

*John C. Mahoney,* Assistant District Attorney, for the Commonwealth.

WHITTEMORE, J. In these cases two defendants appeal under G. L. c. 278, §§ 33A–33G, from convictions for breaking and entering a dwelling house in the nighttime with intent to steal, and for possession of burglarious implements. The defendant Ronald G. Surette also appeals from his conviction for unlawfully carrying a revolver under his control

in an automobile. We state the facts as the jury could have found them from the reported testimony.

On the evening of April 17, 1967, about 8 P.M., as a result of a telephone call to the Boston Police Department, three police officers (Daniel Fallon and John Diggins of the Boston Police and Conrad Lessard of the Dedham Police) drove to the vicinity of 37 Clare Avenue in the Roslindale section of Boston in an unmarked Dedham police car.

The three police officers, as they were arriving at the scene, saw the defendants coming from the front door of the house at 37 Clare Avenue, and proceeding toward an automobile about fifty feet away. Surette entered the automobile and Jones, after hesitation, walked past it along Clare Avenue.

The police car pulled up beside the automobile, the officers got out, Officer Fallon asked Surette for the registration (which showed Surette as the owner), and the other two officers ran to the house at No. 37. Returning to the police car, these officers spoke with Officer Fallon, whereupon Surette was arrested and placed in the police car.

The three officers, within less than half a minute thereafter, drove in the police car to overtake Jones. Officer Diggins asked Jones where he was going. He replied that he was going home "from the Forest Hills MTA Station." That was about "two or three miles" from 37 Clare Avenue. There was a bus route serving the area. Officer Diggins arrested Jones. A search of his person revealed a pair of gloves in a side pocket. Jones was placed in the police car which was then driven back to 37 Clare Avenue. The officers called for a Boston police car which arrived promptly. The defendants were transferred to it.

Surette's automobile was then searched. This was about five minutes after the arrest. A pair of gloves, a screwdriver, and a kitchen knife were found "on the floor in the front, the driver's side"; the gloves and the screwdriver were introduced in evidence. The police also took the car keys from the ignition, unlocked the trunk, and found an unloaded revolver in a paper bag inside a suitcase. The

revolver was also introduced in evidence. When the car was searched the defendants were in the Boston police car which was beside Surette's car about five feet away.

The owner of the house returned to the house about 8:20 P.M. He had left it about half an hour before with the side or "rear" door (leading into the kitchen) locked, the porch door (giving access to the side door) shut, and a dim light in the kitchen. Upon his return he found all the lights on in the front hall and kitchen, the "back [side] door into the kitchen" open, and the front door open and unlocked.[1] A pane of glass in the side door just above the lock was broken, but everything inside the house was as he had left it and nothing was missing. No "jimmy marks" or finger-prints were found at the house.

The defendants were sentenced to serve prison terms for breaking and entering. They were also sentenced to serve shorter terms for possession of burglarious implements. Surette was sentenced to serve a prison term for unlawfully carrying a firearm. The sentences as to each defendant were to be served concurrently with a sentence then being served.

1. The search was at the time of the arrest and was valid without a warrant. It was reasonable in the circumstances. *Commonwealth* v. *Smith*, 353 Mass. 442, 446–448 ("There was nothing remote in the time or place of this search . . . [which followed] immediately upon a legal arrest . . . for the purpose of discovery of the fruits of or means employed in the crime"). See *Commonwealth* v. *Blackburn*, 354 Mass. 200, 202. Compare *Commonwealth* v. *McCleery*, 345 Mass. 151, 153–154 (search, after stopping the defendant's auto-mobile for a minor violation, unrelated to a ground for arrest).

The defendants rely on *Preston* v. *United States*, 376 U. S. 364. The possible application of that case to a search of an automobile contemporaneous with an arrest for burglary

---

[1] A third door was not referred to other than in a description of all the doors to the house, that is, the "front" door, the "side" door ("I use for the rear door"), and "the other one we keep locked on the back."

was carefully considered and rejected in the *Smith* case with a review of other holdings of the Supreme Court of the United States. We note also the references to the *Preston* case in *Cooper* v. *California*, 386 U. S. 58 (car impounded as evidence in a State law narcotics violation could be searched without a warrant a week after the arrest). Both the majority and dissenting opinions in the *Cooper* case (386 U. S. at 59–60, 65), reaffirm the reasonableness of a search incident to an arrest. The justification for such a search stated in the *Preston* case (376 U. S. at 368) (that before the men are under arrest and the car in custody, the car could be moved out of the jurisdiction) does not, in our view, exclude other justification such as is noted in the *Smith* case, *supra*. See *Agnello* v. *United States*, 269 U. S. 20, 30–31. The *Preston* case, where the arrest was for vagrancy and the delayed search was unrelated to the ground of arrest, is, we think (apart from the delay in time), like our *McCleery* case, *supra*, and unlike this case where the police had reasonable cause to believe that they had caught the defendants in a burglary just before their attempted escape in the searched car.

The search of the locked trunk and the suitcase within it was warranted by an apparent burglary and a reasonable basis for believing that means used in or fruits of the crime might be stowed there. See for discussion of the limits of a search incident to an arrest the *Agnello* case, *supra;* *United States* v. *Rabinowitz*, 339 U. S. 56; *Ker* v. *California*, 374 U. S. 23, 41–43; *Stoner* v. *California*, 376 U. S. 483, 486–488.

2. Jones saved an exception to the introduction of the revolver in evidence. There was no error. Included in the indictments under which he was being tried is No. 29401 for illegal possession of a firearm. It was plain from the prosecutor's opening statement that the only firearm to which this indictment related was the revolver found in the trunk. We assume the Commonwealth hoped that the evidence would permit the contention that it was constructively in the possession of Jones. The gun when offered was, in the judge's discretion, admissible under

indictment No. 29401.  At the close of the Commonwealth's case Jones's motion for a directed verdict of not guilty under that indictment was allowed.  Jones did not ask for an instruction that neither the revolver nor Surette's possession of it was evidence against him under the other indictments.  There is, in any event, little basis for assuming that the jury, after the direction of the verdict, would have thought that the gun had any relevance to the other indictments against Jones.  The revolver was unrelated to the strong, direct evidence warranting the conclusion that Jones and Surette had broken into the house and, if that evidence by itself was not convincing, the evidence of the gun was not likely to make it seem so.

3. Jones shows no error in respect of the testimony of Charles Stutzman.  He was a parole officer although this was not stated to the jury.  His testimony was that in February or March, 1967, Jones had telephoned him and said he was James Simmons, but Stutzman recognized Jones from his voice.  Jones was "quite upset" and said he had been approached in Boston and asked for his identification and that he had given it.  As a result of the conversation Stutzman went to see Jones at his home about March 10 and talked with him about twenty minutes. Stutzman asked Jones who was with him when he had been stopped and Jones said that it was Ronald Surette and that was why he had been so upset and had called Stutzman. He asked for advice and Stutzman told him "to stay away from Ronald."

After Stutzman's testimony had been given without objection to the parts set out above, two questions were excluded.  These asked whether Stutzman knew that Jones knew Surette and that the men had been together.  At that point, Jones's attorney stated that he took an exception "to this witness having been allowed to testify" on the ground (stated at the bench) that "even though he did not give his employment on the stand, we do not . . . [know] that a member or members of the jury may not be aware of his official capacity."  Surette's attorney also

objected and the judge sustained his objection, but over-ruled Jones's objection and directed that Jones's exception be noted. We construe Jones's belated exception as a motion to strike.

Stutzman's testimony was marginally relevant to the identification of Jones as Surette's companion. Jones's answer, when apprehended and asked what he was doing, tended to dissociate him from Surette. It was raining; Jones wore a hat; visible identification might have been uncertain; and Jones might have benefited from the conclusion that he may have been a passing stranger. Hence, that he was an acquaintance of Surette was of some relevance.

A reasonable inference from Stutzman's testimony was that he knew Surette as well as Jones. It could have led to speculation whether Stutzman had an official relationship with Jones and had knowledge of Surette in an official capacity and to possibly adverse inferences against either or both defendants. Particularly in view of the strong evidence of identification, the wisdom of thus risking disclosure or suggestion of a prior offence may be questioned. See *Commonwealth* v. *Nassar*, 351 Mass. 37, 46–47. But striking the testimony after it had been given could have raised as much or more speculation inasmuch as it had some relevance to the issue on which the prosecutor made clear it was offered. The action taken by the judge was reasonably within his discretion. *Commonwealth* v. *Dirring*, 354 Mass. 523, 534.

4. Both defendants contend that the evidence did not warrant their conviction for possession of burglarious tools with intent to use them. We disagree.

Plainly neither a screwdriver nor a kitchen knife is by its nature a burglarious tool. But one or the other may be used for an entry to force a sash or a door or to slip a lock. See *Commonwealth* v. *Tivnon*, 8 Gray, 375, 380–381; G. L. c. 266, § 49; Annotation, 103 A. L. R. 1313. It is controlling that they were found together and accessible in the constructive possession of the defendants at the scene of a burglary and, although the date was April 17, in asso-

ciation with a pair of gloves, which, although not burglarious instruments, were useful to avoid leaving finger marks. In the circumstances, the intent to use the tools to break and enter is reasonably inferable. That there was no evidence that the tools were in fact so used does not bar the inference. See *Commonwealth* v. *Tilley*, 306 Mass. 412, 417. The forcible entry, accomplished by the simpler means of breaking a pane of glass, establishes the burglarious intent. In a case where the burglars are caught before the break, the requisite intent must of course be otherwise proved as it was, for example, in the trial reviewed in *Cortellesso* v. *Commonwealth*, 354 Mass. 514, 515–516. But in either case the burglarious intent, when established, colors the possession at the site of suitable tools.

5. Although no exceptions were taken to the charge and no requests were made for correction or amplification, both defendants ask us to reverse the judgments because of parts of the charge. We discern no basis for so doing.

It could not prejudice the defendants that the judge explained to the jury why he had interrupted the argument of counsel for one of the defendants. The judge stated in substance that the suggestion was being made that an inference might be drawn from the failure of the prosecution to call as a witness the neighbor who had telephoned the police and seen the two men leaving the house after the break. The judge said that the suggestion was improper and that his action was based on decided cases and the lack of an indication that the witness was readily available.[2] So far as appears no exception was taken either to the interruption or the explanation. We note nevertheless that in view of the capture of the defendants at the scene and their identification by the officers, no harm appears. See discussion and cases cited in *Grady* v. *Collins Transp. Co. Inc.* 341 Mass. 502.

In the absence of a request to rectify the obviously inadvertent misuse of "unreasonable inference" instead of

---

[2] One of the officers had testified that she was "afraid of her life" if she identified the defendants.

"unfavorable inference"[3] the defendants show no reversible error. The jury were plainly told that no unfavorable inference could be drawn from the fact of the indictment of the defendants. It is most unlikely that, so instructed, they would nevertheless think that the judge intended to let them draw adverse inferences from the fact that the defendants were kept in custody in the courtroom as a result of indictments.[4]

There was nothing prejudicial in the illustration of how inferences may be drawn from circumstantial evidence. The suggestion was that if the jury saw a batter hit a ball in a baseball game "it would be natural for . . . [them] in reasoning to say that the pitcher must have thrown the ball" even though he had not been seen to do so. This did not suggest, as the defendants say, that an inference of entry with intent to steal could be drawn merely from the circumstance that they were seen to leave the premises. The judge rightly charged that the prosecution must show beyond a reasonable doubt that the defendants committed the crimes. He added, "The circumstances taken together must be of a conclusive nature and tendency, leading, on the whole, to . . . a reasonable and moral certainty that the accused and no one else committed the offenses charged; and all the circumstances taken together must point so unerringly to the guilt of the defendants as to exclude every other reasonable hypothesis or conclusion." The baseball illustration followed.

*Judgments affirmed.*

---

[3] "Now beyond this safeguard of presumption of innocence there are other safeguards. The fact that the parties are situated in the courtroom and in that position they are in, no unreasonable inference may be drawn therefrom. The fact that they have been complained of or indicted for the offenses, no unfavorable inference may be drawn therefrom. And in relation to the fact of the matter of the defendants' failure to testify, no unfavorable inference may be drawn therefrom, for the reason that it is the obligation of the Commonwealth to prove the guilt of the defendants beyond a reasonable doubt and there is no obligation on the part of the defendants to prove their innocence."

[4] Counsel on these appeals was not trial counsel. In the absence of any request for a correction by trial counsel after the charge, the appearance in the transcript of the word "unreasonable" in the context of the paragraph does not preclude a misunderstanding or misnoting by the stenographer of the word in fact used.