COMMONWEALTH vs. LANNY A. DELLINGER
(and three companion cases[1]).

Essex. December 10, 1979. — September 29, 1980.

Present: ARMSTRONG, ROSE, & KASS, JJ.

*Conspiracy. Robbery. Larceny. Practice, Criminal,* Directed verdict.
*Search and Seizure. Probable Cause. Possession of Burglarious In-*
*struments. Evidence,* Relevancy and materiality.

At the trial of defendants charged with possession of burglarious tools
and conspiracy to rob a United Parcel Service truck, the judge did not
err in permitting the driver of the truck to testify that he had picked up
a cargo of silver valued at $175,000 just prior to his observing the de-
fendants following him in an automobile. [553]
At the trial of defendants charged with conspiracy to rob, the judge did
not err in denying the defendants' motions for directed verdicts where,
although there was insufficient evidence to warrant a finding that the
defendants had conspired to rob, there was sufficient evidence to sup-
port a conspiracy to steal, a lesser included offense within the crime
charged. [553-559]
In the circumstances, a State trooper had probable cause to believe that
the occupants of an automobile intended to hijack a United Parcel
Service truck and, having knowledge of the occupants' prior convic-
tions of crimes including firearms offenses, he had probable cause to
search the interior of the automobile, the glove compartment, and the
trunk. [559-560]
At the trial of defendants charged with possession of burglarious tools
and conspiracy to rob a truck, evidence that the defendants had screw-
drivers, gloves, and a pair of wirecutters in their automobile when
they were apprehended was insufficient to warrant a finding that they
possessed such tools with a burglarious intent where there was insuffi-
cient evidence that they intended to rob the truck on that day.
[560-561]

---

[1] There were six indictments, two against Dellinger and two apiece
against James A. Lathan and Antonio Nicoletti, Jr. The appeals by Nico-
letti were withdrawn following his death in Providence, Rhode Island, on
May 14, 1980.

Where the evidence at the trial of defendants charged with conspiracy to rob was only sufficient to support a finding of conspiracy to commit larceny, this court ordered, in the interests of justice, that the cases he remanded for resentencing on the lesser included offense. [562]

INDICTMENTS found and returned in the Superior Court Department on February 20, 1979.

The cases were tried before Irwin, J.

Henry A. Follen, Jr., for Lanny A. Dellinger.

John H. Brazilian for James A. Lathan.

Dyanne Klein Polatin, Assistant District Attorney, for the Commonwealth.

ARMSTRONG, J. The defendants were convicted of possession of burglarious tools and conspiracy to rob. The principal witness against them was one Grant, the driver of a United Parcel Service (UPS) truck. Grant testified that on January 17, 1979, following a pickup from Towle Manufacturing Co., a manufacturer of silver products in Newburyport, of a cargo valued at roughly $175,000, and shortly before turning into the parking lot of his next scheduled stop, another Newburyport industrial plant, Gould Corp., he noticed that his truck was being followed by a brown car. The car turned into the Gould parking lot after him and cruised slowly past his truck as he backed up to the loading door. Three men appeared to be looking at the truck through the open windows of the car. The car parked in a rear parking lot not ordinarily used for visitor parking. Grant entered the Gould factory through the loading door; but he became nervous, returned to check the truck, and observed the car cruising slowly past it, the three occupants looking at the truck through open windows on the passenger side. The car then parked in a front parking lot. When Grant completed his business, he saw that the car had left. Snow was falling heavily; by the car's tire tracks he could see that it had turned left on leaving the parking lot. Grant, still apprehensive, turned right, deviating in that respect from his usual route, and headed toward Interstate Route 95 (I-95) about two miles away. Before reaching I-95 he

pulled over to the side of the country road he was travelling on to clean the snow and ice off his windshield and side-view mirrors. The brown automobile soon came into view and passed him slowly. The passenger window was open, despite the snow and cold. He started the truck again and entered the ramp to I-95 southbound. The brown car, which had passed beyond the I-95 interchange, made a U-turn and followed Grant's truck onto I-95. Grant took the next (Byfield) exit. The brown car followed. Grant stopped at an open gas station, and the brown car drove past, disappearing from view. Grant then telephoned from the gas station to the UPS depot in Lynnfield and to the State police. As he was phoning he saw the brown car enter a driveway opposite the gas station which led to the parking lot of a Howard Johnson's restaurant.

When a State police cruiser arrived, Grant told the trooper his story, and the trooper drove Grant through the Howard Johnson's parking lot. Grant pointed out the brown car. It had Rhode Island plates. The trooper got out and checked the plates to see if they were securely attached. They were. The trooper drove Grant back to his truck, told him to reenter I-95 southbound and to proceed directly to the UPS Lynnfield depot. The trooper then watched to see if the brown car would follow the truck. It did, whereupon the trooper signaled the brown car to pull off the road. He asked the occupants for identification, then reentered the cruiser. He had previously checked out the Rhode Island plates by radio, learning that there was no stolen car report. The car was registered to the defendant Dellinger, who was in fact driving. After further radio inquiry the trooper learned that there were no warrants outstanding for the arrest of any of the three occupants. Persisting further, the trooper checked prior criminal records and learned that all three men had criminal records in Rhode Island, including possession of machine guns and sawed-off shotguns; one had been arrested for murder; one had "a very lengthy criminal record for receiving stolen property, breaking and entering, [and] several other serious

criminal offenses . . . ." Three more police officers ar-
rived, from Newbury and Georgetown. Revolvers drawn,
the police ordered the three men out of the brown car. They
were frisked for weapons; none was found. The car was
searched. On the front seat were a black ski mask and a
brown pair of work gloves. Under the front seat, driver's
side, was a pair of binoculars. A red-handled screwdriver
lay on the floor in front of the passenger seat. In the glove
compartment were a stocking cap, a Phillips screwdriver in
a knife sheath, a pair of wire cutters, a yellow-handled
screwdriver, a clear-handled screwdriver, a spotlight of the
type that can be plugged into a cigarette lighter, and a pair
of black leather gloves. In the rear seat were a second pair
of brown work gloves and an extra jacket. The trunk was
searched, disclosing a hammer, a large pair of "water-
pump" pliers, a regular pair of pliers, two more screw-
drivers, and a dent-puller with an extra, larger handle, all
of which were located together just left of center in the
trunk. In the right rear fender well was a heavy plastic
duct which would normally be found between a front fender
and the carburetor; inside it was a clear plastic Halloween-
type mask.[2]

The car and the defendants were taken into custody. A
waitress from the Howard Johnson's restaurant was driven
to the car to identify the men. She and a headwaitress were
to testify at the trial that the defendants insisted on sitting
by a window (which would place them in a position to ob-
serve traffic entering I-95 southbound), asked the waitress if
she knew where the UPS depot was located, looked in a tele-
phone directory, and were acting nervous when they paid
up and left after fifteen to twenty minutes. The headwait-
ress also testified that during that time the defendant Del-
linger went outside for approximately five minutes. The
State trooper testified that he asked the defendants prior to
searching the car what they were doing in the area and was

_____

[2] The contents of the trunk were suppressed, erroneously in our view.
See discussion *infra* at 559-561.

told that they had been in "Portsmouth, Maine," looking for boats. None of the defendants testified or offered a defense.

The defendants objected to the testimony that Grant had picked up a cargo valued at $175,000 at Towle Manufacturing Co. prior to his observing the defendants for the first time. The judge did not abuse his discretion in ruling, in essence, that the Towle pickup had been connected sufficiently to be admissible. Towle was the last stop made before Grant noticed that he was being followed. It would be reasonable to assume that a cargo from a silver-products manufacturer would have an unusual value and be a suitable target for a hijacking. Grant testified that Towle was one of his regular stops and that the stops at Towle were made at roughly the same time each day. Grant's testimony that the defendants turned left out of the Gould lot suggested that the defendants were familiar with Grant's route.

The defendants' motions for directed verdicts present a closer question. The evidence was obviously strong that the defendants were intentionally following the UPS truck. The truck carried a valuable cargo, and the defendants, for the reasons given, could be found to have had either actual knowledge of that fact or reason to believe that such was the fact. Their explanation to the State trooper that they had been boat-shopping in "Portsmouth, Maine" could reasonably (apart from the fact that Portsmouth is in New Hampshire) be found inconsistent with their behavior as reported by Grant. The contents of the car were not as helpful to the Commonwealth's case as they might have been if, as the police doubtless expected, guns had been found; but the abundance of screwdrivers and gloves, as well as the mask from the passenger compartment (the mask in the trunk having been suppressed) and wire cutters were marginally incriminating in light of the strong evidence of purposeful pursuit of a likely robbery target. The mask tended to suggest robbery as opposed to larceny of or from the truck while unattended. Moreover, if, as could be inferred, the defendants knew Grant's route, they presumably would also know that

his stops were finished and that it was unlikely that he would leave the truck until it was returned to the depot in Lynnfield. Thus, there was some evidence that the defendants conspired to rob Grant of his truck and its contents.

"[S]ome record evidence," however, is not enough for the Commonwealth to sustain its burden of proof; in a criminal case the Commonwealth must offer "enough evidence . . . [to] satisf[y] a rational trier of fact of each [essential element of the offense] beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979). One element of robbery is that the taking be by force or threat of force from a person. No guns were found in the car; there was no evidence that guns were jettisoned from the car before the search (contrast *Commonwealth* v. *Tatro*, 223 Pa. Super. 278 [1972]),[3] and the search turned up no obvious means of communicating with confederates who might have had guns. The use of guns (or other weapons) is not, of course, an element of the crime of robbery; nevertheless, their absence tends to cast doubt on the theory that a robbery was to have taken place that afternoon. It is possible, of course, that the defendants intended to cut off the UPS van with their car and advance on its driver unarmed or armed only with screwdrivers; but such a hypothesis cannot be said to have been proved beyond a reasonable doubt; on the record it is speculative and seems, frankly, rather implausible. A more likely hypothesis is that if the substantive offense planned was to be a robbery, the defendants were "casing the job", planning for a robbery at a later date when they

---

[3] In *Commonwealth* v. *Tatro*, four men were circling in a car through a strictly residential area in the evening. The police stopped the car and observed one of the men trying to push an open box containing a walkie-talkie under the front seat. An officer approaching the vehicle from the rear saw certain items being thrown from the car. These were a flashlight, gloves, a radio antenna and a screwdriver. The screwdriver was determined by laboratory tests to have been used in a recent house break in the same area. This evidence was held sufficient to support convictions for conspiracy to commit burglary and possession of burglar tools — although it may well be that the result would have been different were it not for the evidence connecting the screwdriver to a prior house break.

would come suitably armed; but if the substantive offense were to be executed on another day, it is not inconceivable — indeed, it seems almost equally plausible — that the defendants intended to steal the truck while the driver was not in it. Perhaps that was the reason for the defendants' obtrusively close surveillance during Grant's stop at the Gould factory; and such a method of executing the hijacking would avoid exposure to the more severe penalty for armed robbery. But it is apparent that we are engaging in speculation; the only conclusion we can draw with assurance is that, if a theft was planned, the manner of its execution, whether by robbery from the person of the driver or by theft of the truck and burglary of its cargo area, was not proven beyond a reasonable doubt, as is required of the Commonwealth by the Latimore test.

On the other hand, we think there was more than speculation involved in the jury's conclusion that the defendants were conspiring to steal the cargo of the UPS truck, if not on the day they were apprehended then on some other day. No innocent explanation of their behavior suggests itself as a reasonable possibility; and the Commonwealth does not have the burden of eliminating all possibility that the defendants might be innocent. We think that the jury could conclude beyond a reasonable doubt that the defendants were at least conspiring to steal. Perhaps the conspiracy had not progressed beyond the stage where the defendants were "casing the job" with the idea of lining up a suitable target for a theft but without having arrived at a fixed agreement as to target or time or manner; but that is enough, in our view, to prove a charge of conspiracy to steal, for the defendants by that hypothesis were acting in combination for the unlawful and criminal purpose of larceny.

A conspiracy does not begin only after all its details have been settled. If, for example, several men set out in a car late at night looking for an open gas station to rob, or if several men prowl a park together looking for suitable victims to mug, we have no doubt in either case that the conspiracy is complete before the target is selected. Cases are

not likely to surface in that posture, because the clandestine purpose of the conspirators is usually not discoverable by the public until a target has been selected and some additional action has been taken toward perpetration of the substantive offense. Before that time proof would as a practical matter depend on admissions of one or more of the conspirators; but, recognizing the problem of adducing sufficient evidence, we see no reason in principle why the joint plotting of a crime is not a criminal conspiracy before its details are complete.

Imminence is not a requirement of a criminal conspiracy, as it is of a criminal attempt. See *Commonwealth* v. *Peaslee,* 177 Mass. 267 (1901); *Commonwealth* v. *Burns,* 8 Mass. App. Ct. 194, 196 (1979). A crime like the Brinks robbery (*Commonwealth* v. *Geagan,* 339 Mass. 487 [1959]) may be in preparation months before it is executed; but the conspiracy exists from the start of the planning because the essence of the conspiracy is the combination for an unlawful purpose. *Commonwealth* v. *Winter,* 9 Mass. App. Ct. 512, 526 (1980), and authorities cited. Perkins, Criminal Law 614-615 (2d ed. 1969). It is immaterial by that definition that the planned crime is not imminent, or that its details are not all worked out, or that time remains for one of the conspirators to withdraw or, indeed, for the whole plan to be scrapped. The crime of conspiracy is complete when the conspirators agree to work in concert for the criminal or corrupt or unlawful purpose. Absent direct evidence from one of the conspirators, proof of that purpose must necessarily depend on circumstantial evidence. *Commonwealth* v. *Benesch,* 290 Mass. 125, 131 (1935). *Commonwealth* v. *Nelson,* 370 Mass. 192, 200-201 (1976), and 205 (Hennessey, C. J., dissenting). *Commonwealth* v. *Benjamin,* 3 Mass. App. Ct. 604, 633 (1975). Here, as we have said, we think that the jury, drawing reasonable inferences from the evidence before them, could conclude that the defendants were, beyond a reasonable doubt, conspiring to commit the felony of larceny of goods over the value of $100, G. L. c. 266, § 30. The total crime planned may well have

been robbery; but, as the details of the plot remain shrouded in secrecy, we think that the Commonwealth could not sustain its burden of proving beyond a reasonable doubt that the defendants conspired to rob; and on a properly framed objection the case should not have been submitted to the jury on that charge.

The defendant's objection to the sufficiency of the evidence took the form of motions for directed verdicts of not guilty. Those motions did not differentiate between conspiracy to rob and conspiracy to steal. The judge was required to allow the motions only if, as matter of law, the defendants could not be convicted of conspiracy to steal on an indictment for conspiracy to rob.

We have found no authority directly on that point. The obvious analogy is the law of lesser included offenses, in accordance with which a charge of stealing, or larceny, is held to be a necessary part of, and thus included within, a charge of robbery. *Commonwealth* v. *Novicki*, 324 Mass. 461, 465-466 (1949). That rule is based on the familiar elements-of-the-offense analysis which may not, strictly speaking, be applicable when the charge is conspiracy. That is, the elements of conspiracy are traditionally said to be (1) a combination (2) for an unlawful purpose (or, alternatively, for a lawful purpose but by unlawful means); and under the common law, by which a conspiracy was considered to be a misdemeanor, regardless of the object, it was largely immaterial whether the purpose (or the means, if that was the unlawful aspect) was felonious in nature, or was a misdemeanor only, or was merely unlawful.[4]  See *Commonwealth*

---

[4] That was the basis of our decision in *Commonwealth* v. *Soule*, 6 Mass. App. Ct. 973 (1979), where we held that a charge of conspiracy to violate the Controlled Substances Act, without specifying a particular section of that Act, was a good indictment. See also *Commonwealth* v. *Deagle, post* 563 (1980), in which the same question arose but did not have to be decided. The problem in those cases was that under G. L. c. 94C, § 40, the punishment for such a conspiracy depended on the punishment for the particular offense set out in c. 94C which was the object of the conspiracy; and it was argued, not unreasonably, that under a statute like § 40 an indictment or charge should not be considered valid unless it

v. *Hunt,* 4 Met. 111, 123 (1842); *Commonwealth* v. *Dyer,* 243 Mass. 472, 485 (1922); *Commonwealth* v. *Chagnon,* 330 Mass. 278, 280-281 (1953); Perkins, Criminal Law 613-614 (2d ed. 1969). As to the "merely unlawful" category, contrast Sayre, Criminal Conspiracy, 35 Harv. L. Rev. 393 (1922). Under a modern conspiracy statute such as G. L. c. 274, § 7, inserted by St. 1968, c. 721, § 1, which specifies graduated punishments depending on the penalty prescribed for the substantive offense which is the object of the conspiracy (or the means by which the object is to be accomplished), it is probably more practical and useful to think of the elements of the crime which is allegedly the object of the charged conspiracy as elements of the crime charged against the defendant. Adopting this analysis we could say that a conspiracy to steal is, in effect, a lesser included conspiracy within the crime charged: namely, conspiracy to rob. By this analysis the motions for directed verdicts, which were addressed indiscriminately to the greater and lesser included conspiracies, were properly denied. *Commonwealth* v. *Novicki, supra* at 465-466.

Under the more traditional analysis, the elements of the conspiracy have been treated simply as (1) the combination (2) for an unlawful purpose. That formulation tends to suggest a possible variance between the purpose of the conspiracy as alleged and its purpose as proved. However, it has never been a rigid requirement that the unlawful purpose of the conspiracy be proved precisely as it is alleged. *Commonwealth* v. *Meserve,* 154 Mass. 64, 72-73 (1891). *Commonwealth* v. *Ries,* 337 Mass. 565, 581-582 (1958). The rule which seems to have developed is that any variation between the allegation and the proof of the content of a

should set out the object of the alleged conspiracy with sufficient particularity to enable the defendant to ascertain the penalty that he is in jeopardy of incurring if found guilty; or, in other words, that the elements of the particular offense under the Controlled Substances Act which is alleged to be the object of the conspiracy should be considered to be elements of the crime which must be specifically charged where the penalty turns on their presence or absence.

conspiracy is a ground for a directed verdict only if the defendant has been substantially misled to his prejudice. *Berger* v. *United States*, 295 U.S. 78, 81-83 (1935). The defendants cannot be held to have suffered any prejudice where the conspiracy proved against them was wholly encompassed within, but was less than all of, that which was charged. And, as a criminal conspiracy was proved, we again conclude the defendants were not entitled to a directed verdict of not guilty.

The defendants also press on appeal their motion to suppress the evidence derived from the search of the car. There was no merit to that motion. The State trooper had probable cause to believe that the defendants intended to rob or steal the UPS truck. Grant had told him the story of the long and presumably purposeful pursuit. The defendants had given an inferably untruthful account of their activities. In addition, the trooper knew that the defendants had lengthy and serious criminal records, including offenses involving firearms. Such evidence, although inadmissible at the trial, may be considered by a policeman in making his on-the-scene determination of probable cause, *Brinegar* v. *United States*, 338 U.S. 160, 172-174 (1949), although it is not by itself sufficient to establish probable cause. *Beck* v. *Ohio*, 379 U.S. 89, 97 (1964). Evidence of prior criminal activity is not excluded at trial by reason of want of relevancy or probative force; to the contrary, it is ordinarily excluded because, in common experience, it is a fact so probative of guilt that its admission would leave a defendant little chance of escaping conviction no matter how sparse the other evidence connecting him to the offense charged. 1 Wigmore, Evidence § 194 (3d ed. 1970). To import such a restriction into the investigatory stage would mean that "few indeed would be the situations in which an officer, charged with protecting the public interest by enforcing the law, could take effective action toward that end." *Brinegar* v. *United States, supra* at 174.

As the State trooper had probable cause to believe the defendants intended to hijack the UPS truck, we think,

especially in light of the defendants' prior convictions of firearms offenses, that he also had probable cause to believe that the car contained firearms. It is clear that the probable cause supported a search not only of the car but of the glove compartment and the trunk as well. *Chambers* v. *Maroney*, 399 U.S. 42, 51-52 (1970). *Arkansas* v. *Sanders*, 442 U.S. 753, 757 (1979).[5]

The defendants also filed motions for directed verdicts on the charge of possession of burglarious tools, which were denied. If the evidence had been sufficient to show that the defendants intended to effect a hijacking of the UPS van on the day of their apprehension (as it would have been, we think, if guns or other weapons had been found in the car; compare *United States* v. *Jensen*, 462 F.2d 763 [8th Cir. 1972][6]), then it would have been reasonable to draw an in-

---

[5] The decision of the trial judge to exclude the dent puller and other tools and mask found in the trunk appears to have been based on a ruling that the trooper, at the time of the search, had only a reasonable suspicion, warranting only a limited search for weapons within the reach of the defendants, as in *Terry* v. *Ohio*, 392 U.S. 1 (1968). That ruling seems hard to reconcile with the judge's decision to send the case to the jury on the full charge of conspiracy to rob, and later to sentence for the full offense as charged, because the proceeds of the search and the testimony of the Howard Johnson's personnel added little, if anything, of probative force to what the State trooper already knew at the time of the search.

[6] In *United States* v. *Jensen*, the three defendants were arrested as they sat in the front seat of a stolen Ford parked in a bank parking lot. There were three loaded pistols and three stocking caps found in the car, as well as two shopping bags. There was a stolen Cadillac parked three blocks from the bank, and there was testimony by a person who had seen it being parked that its occupants had been picked up by a Ford resembling the one in the bank lot. This evidence was held insufficient to support the Federal offense of conspiracy to rob the bank. "[T]he appellants may as well have planned no crime at all or may have planned to rob an armored car as it drove into the parking lot with a shipment of money for the bank, or to drive two blocks to a large shopping center and rob one of the establishments there, in which events, state offenses only would have been committed." 462 F.2d at 765. The *Jensen* case shows that the sufficiency of the evidence to prove conspiracy to rob would have presented a close question even if guns had been found; but we think that a valid distinction can be drawn, in that, in the present case, the evidence connecting the defendants to the UPS truck had substantially stronger probative force than the evidence connecting the defendants in the *Jensen* case to the bank.

ference that the tools found in the car, the screwdrivers, wire-cutter, light and gloves, were to be used in effecting the crime. The truck had a large cargo area, the doors to which were locked at all times, except in loading or off-loading. It could be found to be a depository within the meaning of G. L. c. 266, § 49, compare *Commonwealth* v. *Armenia*, 4 Mass. App. Ct. 33, 38 (1976), and the most probable inference would be that the defendants intended to steal the cargo within the locked area. Contrast *id.* at 38-39. The screwdrivers and wire cutter could be found to be adapted to that function.

But because the evidence did not warrant a finding that the hijacking was to be executed that day, the inference that those were the tools to be used in the hijacking is much attenuated. It seems more likely that the defendants would bring tools better suited to the task: pry bars, sledge hammers, skeleton keys, or explosives, for example. The tools which were admitted in evidence, screwdrivers, gloves and a pair of wirecutters, are not by themselves particularly unusual or incriminating. Contrast *Commonwealth* v. *Tilley*, 306 Mass. 412, 417-418 (1940). The dent-puller appears less innocent, *Commonwealth* v. *Graud*, 8 Mass. App. Ct. 915 (1979), but it was excluded from evidence and may not now be considered. Under G. L. c. 266, § 49, ordinary tools may take on the character of burglarious tools if they are intended to be used for burglarious purposes, *Commonwealth* v. *Jones*, 355 Mass. 170, 176-177 (1969); but an intention to use the tools that were found in the car in connection with a probable hijacking on some future day was not shown by the evidence beyond a reasonable doubt. A burglarious intention can doubtless be inferred from mere possession of tools uniquely or very highly adapted to burglarious purposes like those in *Commonwealth* v. *Tilley*, *supra*; but an intention to use ordinary tools for unlawful purposes must appear clearly from the circumstances in which they are found. Such was not the case here. The motions for directed verdicts with respect to the possession-of-tools charges should have been allowed.

Although the motions for directed verdicts on the conspiracy count were properly denied, we have held that the defendants were entitled to have the conspiracy charge submitted to the jury as if it charged only a conspiracy to commit larceny of goods in excess of one hundred dollars, if the point had been properly raised. The defendants were sentenced on the conspiracy count to fifteen to twenty years in State prison, a sentence within the twenty-year maximum sentence fixed by G. L. c. 274, § 7, for a conspiracy to rob, but in excess of the five-year maximum sentence fixed by the same statute for a conspiracy to commit larceny of more than $100. The discrepancy is considerable, and although no proper objection was raised, we think that it would be a miscarriage of justice to allow the sentence to stand. *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967). The case will therefore be remanded to the Superior Court for resentencing on the conspiracy count, the guilty verdict to stand as one of conspiracy to commit grand larceny, G. L. c. 266, § 30, in accordance with the principles discussed in *Commonwealth* v. *Novicki*, 324 Mass. at 467, and *Commonwealth* v. *Eaton*, 2 Mass. App. Ct. 113, 119 (1974).

The judgments are reversed. The verdicts on the indictments for possession of burglarious tools are set aside, and the judgments are to enter for the defendants on those indictments. The defendants are to be resentenced on the conspiracy indictments upon verdicts of guilty of conspiracy to commit larceny of property of a value in excess of $100.

*So ordered.*