COMMONWEALTH vs. JAMES PRESTON.

No. 86-142.

Essex.   December 15, 1988. — February 21, 1989.

Present: ARMSTRONG, KASS, & WARNER, JJ.

*Homicide. Probable Cause. Search and Seizure*, Affidavit. *Evidence*, Prior
conviction. *Practice, Criminal*, Impeachment by prior conviction.

The information in an affidavit in support of a search warrant furnished prob-
able cause for the search of a criminal defendant's apartment. [20-21]
Sufficient evidence was presented at the first trial of a murder indictment, so
that retrial, after the grant of a new trial, was not barred by double
jeopardy principles [21-22]; and sufficient evidence was presented at
the retrial to warrant the denial of the defendant's motion for a required
finding of not guilty. [22]
In a criminal case no issue with respect to the judge's failure to rule on the
defendant's motion to exclude impeachment evidence of a prior convic-
tion of armed robbery was preserved for appellate review, where the
defendant neither pressed for a ruling nor testified. [22-24]

INDICTMENT found and returned in the Superior Court De-
partment on February 9, 1983.

A pretrial motion to suppress evidence was heard by *John
T. Ronan*, J., and the case was tried before him.

*John R. Campbell* for the defendant.

*Dyanne Klein Polatin*, Assistant District Attorney, for the
Commonwealth.

*Willie J. Davis*, amicus curiae, submitted a brief.

ARMSTRONG, J.   The defendant appeals from his second
conviction of the murder (in the second degree) of Thea Pierce.
After his first conviction, the trial judge granted a motion for
a new trial. The Commonwealth appealed from that ruling
without success. See *Commonwealth* v. *Preston*, 393 Mass.
318 (1984). The defendant then moved in the Superior Court
for dismissal of the indictment on the ground that the evidence at

his first trial had been insufficient to warrant conviction and that retrial would violate the Fifth Amendment prohibition against double jeopardy in the Federal Constitution. When that motion was denied, the defendant filed in the Supreme Judicial Court a complaint for relief under G. L. c. 211, § 3. A single justice of that court denied relief. The defendant's appeal from that order was dismissed as moot because the defendant by that time had already been retried and reconvicted. See *Commonwealth* v. *Preston*, 396 Mass. 1006 (1985). The double jeopardy point thus remains open for review, in the form of the correctness of the ruling thereon in the Superior Court. The defendant also raises in this appeal the second trial judge's denying a motion to suppress evidence obtained in a search of the defendant's apartment, denying his motion for a required finding of not guilty, and not allowing a motion to bar the prosecutor from using the defendant's prior convictions for impeachment purposes.

Essentially the same question is at the nub of all of the defendant's contentions but the last (relating to the prior convictions): Did the evidence adduced by the police after discovering the dead body of Thea Pierce furnish a rational basis for an inference that she had been murdered by the defendant Preston? The question surfaced first when the police applied for a warrant to search Preston's apartment. The investigating officer's affidavit laid out the following case.

Responding to an anonymous phone call on Monday, January 17, 1983, the police went to an apartment where Thea Pierce, a twenty-nine year old, single, working woman, lived alone. The apartment was in disarray to a degree suggesting a struggle. Thea Pierce's dead body was in the bathtub, which was half to three quarters full of water smelling of Lestoil cleaning fluid (a bottle lay open on the floor). Her hands and feet were tied behind her back, and to each other, with articles of clothing. She appeared to have been strangled by a scarf wrapped around her neck. The body was otherwise unclad but for a sweater, unbuttoned blouse, and bra, all pulled up over her breasts, and long socks. Semen in her vagina, coupled with the condition of her clothing, suggested the possibility that Pierce had been

raped by her killer. Towels and a towel rack had been piled
into the tub with the body. The shower curtain was ripped off
and lay on the floor outside the bathroom. The bedroom was
in similar disorder. Boots lay on the floor with pants and
underpants which were turned inside out. The pants zipper was
broken, suggesting that the pants had been forcibly torn from
the body. A coat lay on the bed, with a substantial clump of
hair appearing to the officer to be identical to Thea Pierce's
and again suggesting forcible removal. A torn piece of the
neck-scarf was in the bedroom. Phones were severed. An empty
wallet lay on the floor. The police were unable to find anywhere
in the apartment the credit cards, driver's license, and other
likely wallet contents that they knew (from evidence such as
bills) she must possess.

Three strands of evidence led the police to suspect Preston,
who lived in another apartment, two and one-half flights down,
in the same building.

The first strand established opportunity. On Friday morning,
January 14, 1983, three days before the discovery of her body,
Thea Pierce did not appear at her place of work, Digital Com-
puter Corporation in Tewksbury. She normally arrived between
8:15 A.M. and 8:30 A.M. and was faithful about phoning in if
she was to be absent or late. She did not phone in that Friday.
At 7:45 A.M. that morning, Wendy Hoehn, whose apartment
was on the same floor as Thea Pierce's, was leaving her apart-
ment and was startled by the presence of Preston, who appeared
to be hiding in the dark behind a vent shaft outside Thea
Pierce's apartment and next to the third apartment on the floor,
belonging to Steven Devine. Preston jumped out (saying,
"Boo") and explained that he was waiting for Devine, who
was supposed to meet him. He asked Wendy Hoehn if she had
the key to let him in to Devine's apartment, which she did.
Shortly after 8:00 A.M. one Josephine Estevez, who lived in
the apartment below Thea Pierce's (and who had overheard
the conversation between Wendy Hoehn and Preston, correctly
identifying both persons from their voices), heard noises com-
ing from the room above her own, which was Thea Pierce's
bedroom. Estevez heard a woman's voice shouting "No" several

times, noises that sounded like articles being thrown, and sounds of crying. When questioned the following week, Steven Devine denied that he was supposed to have met Preston, saying Preston knew that Devine was staying at his girlfriend's. A police officer drove the distance from the apartment house to Digital Computer Corporation, timing the trip at fifteen, possibly twenty, minutes. He surmised that, in the normal course, Thea Pierce would be leaving her apartment at 8:00 A.M. or shortly after to make work by 8:20 or 8:30. Thus, the police hypothesized that Thea Pierce might have been waylaid by the killer just as she was leaving her apartment for work Friday morning, when Preston was seen waiting outside her door.

The second strand of evidence related to motive. Thea Pierce kept a diary, and entries in it showed that she had failed to receive two insurance checks and a bank statement. Her inquires to the insurance company disclosed that the missing checks had been cashed and returned to the company. The checks were endorsed with her name and James Preston's. She had reported this to postal authorities, who had interrogated Preston and obtained handwriting exemplars from him and Thea Pierce for analysis. Preston admitted signing his own signature to the first check: his story was that Thea Pierce had endorsed it to him when he sold her cocaine. She had denied such a transaction. The second insurance check, endorsed and negotiated after her bank statement had been stolen, indicated an attempt by the endorser to duplicate Thea Pierce's signature. An entry in Thea Pierce's diary dated December 29, 1982, read:

> "I called State Farm today and have gotten back the cancelled checks (and a James Preston signed my name and his . . . The asshole didn't even attempt to match signatures on the first check. The second one was closer cause by then he had my cancelled checks and bank statements). He lives here in apartment 2. I don't know yet what I should do . . . I'm scared too . . . I have got to reach the postal inspector."

When the police found Thea Pierce's body, a personal phone book in the bedroom lay open to the number of the postal inspector.

The third strand of evidence leading the police to suspect Preston had to do with hair samples gathered from the bed and the bathroom in Pierce's apartment. Some of the hairs were Thea Pierce's. Others were identified by the Federal Bureau of Investigation testing laboratory as Negroid in origin. Thea Pierce's close friends, male and female, were white. The only known black friend, a colleague at work, knew her only casually. He had last been in her apartment a month and one-half before, and he had not, he said, been in the bedroom. Unless the killer was black, the police could not account for the hair samples. Preston is black.

The preceding was the state of the evidence disclosed by the affidavit supporting the search warrant. The application sought permission for two things: a search of Preston's apartment for the missing bank statement, driver's license, credit cards, etc., and authority to take hair samples from Preston. The requested warrant was issued by a clerk-magistrate. The motion to suppress raised the question whether the affidavit furnished sufficient links to Preston to rise to the level of probable cause that he was the killer and that the missing items would be found in his apartment. We agree with the trial judge (and with the clerk-magistrate) that it did. The affidavit furnished a reasonable basis for an inference that the killer broke into Thea Pierce's apartment as she was leaving for work Friday morning, January 14, shortly after Preston had been seen waiting, seemingly hiding, on the landing outside her door. He was being investigated for taking her mail, as to which there was strong evidence against him. The fact that the phone book in the bedroom was open to the number of the postal inspector, coupled with the severed phone lines, suggested the possibility of a thwarted attempt by Thea Pierce shortly before dying to reach the officer who had been investigating the case. And the presence of Negroid hairs not only in the bed but also in the tub with the dead body, coupled with the absence of close black friends, suggested the killer was

black and was consistent with Preston's having been the killer. The affidavit also set out Preston's prior criminal record — one which showed convictions for serious crimes including armed robbery. Compare *Commonwealth* v. *Grzembksi*, 393 Mass. 516, 521-522 (1984); *Commonwealth* v. *Germain*, 396 Mass. 413, 418 (1985). At the search warrant stage the prior record is entitled to weight as evidence of criminal disposition. *Brinegar* v. *United States*, 338 U.S. 160, 172-174 (1949). *Beck* v. *Ohio*, 379 U.S. 89, 97 (1964). *Commonwealth* v. *Dellinger*, 10 Mass. App. Ct. 549, 559 (1980), *S.C.*, 383 Mass. 780 (1981).

"The requirement of probable cause is satisfied by showing facts which would warrant a man of reasonable caution in believing that certain action is appropriate." *Sullivan* v. *District Court of Hampshire*, 384 Mass. 736, 744 (1981). "[T]he government must demonstrate 'more than a suspicion of criminal involvement, something definite and substantial, but not a prima facie case of the commission of a crime, let alone a case beyond a reasonable doubt.'" *Ibid.*, quoting from *Commonwealth* v. *Bond*, 375 Mass. 201, 210 (1978). This standard was, in our view, amply met by the challenged affidavit. The judge correctly ruled that the search warrant was valid.

By the time of the trials (both first and second) the Commonwealth was able to adduce additional evidence tending to corroborate the hypothesis upon which the warrant was based. Handwriting analysis furnished expert testimony that Thea Pierce's endorsements on both checks were written by Preston. The search of his apartment had turned up Thea Pierce's bank statement with processed checks (although not the credit cards or driver's license), as well as a postal notice of a package to be delivered to her. The FBI crime laboratory, on a more detailed analysis, had confirmed that various hairs from both the bed and the tub were Negroid in origin and, working with two head hairs recovered from the tub that were sufficiently distinctive for more exacting comparison, had identified both hairs as having twenty-five or more of the same microscopic characteristics as head hairs of Preston. (Fifteen were the minimum necessary for a meaningful personal comparison.) A

nonfunctioning hall light which should have illuminated the vent shaft where Preston waited in darkness outside Thea Pierce's apartment on January 14 had turned out to be simply unplugged, rather than burned out or broken. It had been illuminated at 3:30 A.M. that same morning (i.e., four and a half hours earlier), when Wendy Hoehn's boyfriend had left her apartment. From the snow that began Saturday and continued through Sunday, it was apparent that Thea Pierce's car had not been used after Friday. Certain discrepancies in Preston's story to the police concerning his whereabouts the morning of January 14 [1] indicated an attempt to conceal his activities. Overall we have no doubt that the evidence viewed in its entirety, although circumstantial, warranted a rational jury in finding beyond a reasonable doubt that Preston was the killer. [2]

The upshot of this conclusion is, as applied to the first trial, that the judge correctly denied the motion to dismiss the indictment on the ground of double jeopardy and, as applied to the second trial, that the judge correctly denied Preston's motion for a required finding of not guilty.

Also unavailing is the claim of error based on the defendant's motion to preclude the Commonwealth from impeaching him with his record of prior convictions. See *Commonwealth* v. *Chase,* 372 Mass. 736, 750 (1977). When the motion was

---

[1] He told the police, for example, that he surprised Wendy Hoehn on the ground floor landing rather than up two flights outside Thea Pierce's apartment. He claimed to have come out to talk with her after he saw her start her car in the lot, but there was evidence that her car was parked in a place that would not have been visible from his window.

[2] Preston argues that the Commonwealth's theory was undermined by the testimony of two men (the landlord and an insect exterminator) who entered the apartment on Saturday and failed to notice Thea Pierce's body in the bathtub. In fact, their testimony indicates that they were only in the apartment for a brief period and did not enter the bathroom. The landlord testified that, while the door to the bathroom was ajar, the room was dark, and the only thing he noticed as he went by the bathroom was something projecting from the tub which looked like a suitcase. When he was shown a photograph of the bathroom, he identified the towel rack, which was protruding from one end of the tub, as the item he thought was a small suitcase. The landlord and the exterminator both testified to the extreme disarray in the apartment on Saturday, thereby tending to corroborate the Commonwealth's theory that the violence had occurred earlier.

heard, the trial judge expressed some confusion about the state of the law. The trial was in 1985, not long after it had been held in *Commonwealth* v. *Maguire*, 392 Mass. 466, 467-470 (1984), that a judge's discretion to permit impeachment by prior convictions would be subject to appellate review. Unlike *Commonwealth* v. *McFarland,* 15 Mass. App. Ct. 948, 949 (1983), the judge was here correctly advised by both counsel that he had discretion to allow or deny the motion. Compare *Commonwealth* v. *Knight*, 392 Mass. 192, 195 (1984). The judge said he would study the recent case law overnight and rule in the morning. Nothing more appears on the subject. Defense counsel did not ask for the ruling, and the defendant did not testify. Thus the record shows neither that the judge thought that he had no discretion to preclude the use of the prior convictions nor that he would have exercised his discretion by reference to an improper standard. Contrast *Commonwealth* v. *Guilfoyle*, 396 Mass. 1003, 1004 (1985); *Commonwealth* v. *Ruiz*, 22 Mass. App. Ct. 297, 301-302 (1986), *S.C.*, 400 Mass. 214 (1987); *Commonwealth* v. *Roucoulet*, 22 Mass. App. Ct. 603, 608 (1986). This is not a case like *Commonwealth* v. *Boyer*, 400 Mass. 52, 56-59 (1987), where defense counsel failed to object to the denial of a *Chase* motion and appellate review was governed by the "substantial risk of a miscarriage of justice" standard. Rather, the present case is analogous to *Commonwealth* v. *Reid*, 400 Mass. 534, 537-540 (1987), where the defendant's counsel failed to file a *Chase* motion at all and the defendant, who testified, was impeached by fourteen prior convictions. There is no meaningful distinction between not filing a *Chase* motion, as in *Reid*, and filing it but not pressing for a ruling, as here. In either event review will be under the standard applicable to claims of ineffective assistance of counsel. *Reid* at 537. Ineffective assistance will not ordinarily be found unless "under the circumstances of [the particular] case it would have been an abuse of discretion not to exclude [the prior convictions]." *Id.* at 539. It is at least difficult, if not impossible, to show an abuse of discretion in the absence of a "substantial similarity" between the offenses being tried and the prior convictions. *Id.* at 538-540.

The defendant here was on trial for murder, second degree. The only prior conviction involving violence was one for armed robbery. In *Commonwealth* v. *Fano*, 400 Mass. 296, 304 (1987), a prior armed robbery conviction was held to be not substantially similar to murder in the first degree (not felony-murder), for which the defendant was on trial. Compare also *Commonwealth* v. *Walker*, 401 Mass. 338, 344-346 (1987), in which prior convictions of larceny, robbery, and assault by means of a dangerous weapon were held only "somewhat similar" (at 345) to the crimes of murder, armed robbery, and unlawfully carrying a firearm for which the defendant was being tried. It would not have been an abuse of discretion in this case for the judge to have denied the *Chase* motion as to all prior convictions. Contrast *Commonwealth* v. *Rossi*, 19 Mass. App. Ct. 257, 258-260 (1985), where ineffective assistance of counsel was found because it would have been error for the judge not to exclude the prior convictions had the issue of their admissibility been raised.

A further distinction is important. In the *Reid* and *Rossi* cases, the defendants testified and were impeached by prior convictions. Here the defendant elected not to testify. It may not be necessary in our practice for a defendant to testify to preserve for appellate review the correctness of the denial of a *Chase* motion. See *Commonwealth* v. *Fano*, 400 Mass. at 301 n.9; *Commonwealth* v. *Cordeiro*, 401 Mass. 843, 854 (1988). We think, however, that such an issue is not preserved for appellate review where a defendant neither presses for a ruling on the *Chase* motion nor testifies. It must be assumed, in such a case, that the defendant may have decided not to testify for reasons other than his record of prior convictions and decided therefore, as a tactical judgment, that the *Chase* motion was an irrelevancy. This may well have been what happened in the present case, where the defendant was represented by capable and experienced counsel.

*Judgment affirmed.*