COMMONWEALTH vs. ARTHUR FANO.

Essex.  May 4, 1987. — June 16, 1987.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Evidence,* Prior conviction. *Witness,* Impeachment. *Intent. Intoxication. Practice, Criminal,* Instructions to jury.

At the trial of a murder case the judge properly exercised his discretion in ruling that the defendant's prior criminal convictions would be admissible for impeachment purposes, where, although as a consequence the defendant did not testify, the theories of his defense, presented through cross-examination, were not affected. [303-304]

A criminal defendant's record of convictions for robbery and manslaughter, which were not substantially similar to the murder for which he was being tried, were properly ruled admissible for impeachment purposes. [304-305]

At the trial of an indictment for first degree murder, no substantial likelihood of a miscarriage of justice warranting relief under G. L. c. 278, § 33E, appeared in the judge's failure to instruct the jury, on his own initiative, as to the effect of voluntary intoxication on the defendant's ability to form a specific intent, where the minimal evidence of intoxication was insufficient to raise this issue. [305-308]

INDICTMENT found and returned in the Superior Court Department on September 5, 1984.

The case was tried before *John T. Ronan,* J.

*Robert L. Sheketoff* for the defendant.

*Lila Heideman,* Assistant District Attorney (*Robert N. Weiner,* Assistant District Attorney, with her) for the Commonwealth.

ABRAMS, J. Convicted of murder in the first degree, the defendant, Arthur Fano, appeals.[1] See G. L. c. 265, § 1 (1984

---

[1] The defendant was sentenced to life imprisonment, to be served on and after completion of any sentence he was currently serving. The defendant was on parole for manslaughter, armed robbery while masked, and escape convictions at the time of this crime.

ed.). The defendant alleges error in the denial of his motion to exclude evidence of his prior criminal convictions. See G. L. c. 233, § 21 (1984 ed.). The defendant also claims error in the failure of the judge to instruct the jury on the effect of voluntary intoxication. We conclude that there is no error. We also have reviewed the case pursuant to G. L. c. 278, § 33E (1984 ed.), and conclude that there is no reason to exercise our power under G. L. c. 278, § 33E, in favor of the defendant.

We summarize the evidence. On May 25, 1984, the body of the victim, James Hemond, was discovered on the bank of the Merrimack River. Medical evidence revealed that the victim died as the result of a single gunshot wound to the head. The medical examiner estimated that the victim had been dead for between two and seven days prior to the autopsy. The Commonwealth's medical expert opined that the body had not been outdoors for more than one day prior to its discovery. The Commonwealth had no suspects at this time.

On May 18, 1984, the defendant had been introduced to the victim by a coworker, Margaret Billings.[2] The defendant and a friend, Lawrence Nicgorski,[3] worked the night shift at a plastics company, where they had met Billings. On this same day, May 18, Billings, who had been staying at a shelter for the homeless, decided to stay with the defendant in his room at a rooming house in Lawrence. Nicgorski lived in the room adjacent to the defendant's room. When Billings introduced the victim to the defendant and Nicgorski, the four decided to meet later that night to go to work together.

That night, instead of going to work, the four met at a bar. Because the victim recently had moved out of a house he shared with his girl friend, he asked Billings to move in with him. Although Billings remained noncommittal, the defendant became extremely angry and insisted that Billings was not going to move in with the victim, but instead would stay with

[2] Billings was one of the Commonwealth's main witnesses.

[3] Nicgorski was indicted as an accessory after the fact to murder. See G. L. c. 274, § 4 (1984 ed.). At voir dire, Nicgorski was called by the defendant as a witness. He invoked his privilege against self-incrimination at the defendant's trial.

him (the defendant). Because the victim did not have any place to stay, Nicgorski asked him if he wanted to stay with him at his room in the rooming house. The victim agreed.

The next day, Billings and the three men went to the dog races. Before leaving the rooming house, the defendant gave Billings a gun and a bullet and asked her to put them in her pocketbook. She did so. The defendant told Billings that he needed the gun because he and Nicgorski were going to "make a score."

At the race track, the defendant and Billings conversed about Billings's living situation. The defendant told her that she was not going to move in with the victim. Once again, Billings stated that she did not know what she was going to do. The defendant then stated that he was "going to take care of business." Later that evening, after Billings had gone to sleep, she was awakened by an argument coming from Nicgorski's room.[4] Billings stated that she recognized the voices of the victim and the defendant arguing about whether Billings would remain with the defendant or move in with the victim.

The following day, May 20, 1984, the four went to New Hampshire to purchase beer. They returned to the defendant's room to drink the beer. Billings did not know how much beer had been purchased or consumed, but she stated that, by the evening, the men had consumed "quite a bit" of beer. She stated that she did not know if the defendant was drunk.

During the evening, the three men left the defendant's room and Billings went to sleep. Once again, she was awakened by the sound of an argument between the defendant and the victim concerning her living situation. Billings stated that she got out of bed and moved to a chair. Shortly thereafter, Nicgorski entered the room and sat in another chair. Later, the defendant came into the room, went to the head of the bed, and removed his revolver from between the mattress and boxspring.

The defendant loaded the gun with two bullets. The defendant then stated that he was going to "take care of business"

---

[4] The defendant's room shared a wall with Nicgorski's room.

and left the room. Billings stated that she heard a gunshot. The defendant returned with the gun and put it back in the hiding place between the mattress and boxspring. The defendant stated that he had "taken care of business" and that he would take care of the gun[5] once he had gotten "rid of the garbage." Billings stated that the defendant told Nicgorski to lock the door to his room. The defendant threatened to kill Billings if she said anything to anyone about the shooting. The defendant then left the room again and returned with the victim's wallet. The defendant split the money in the wallet with Nicgorski. Finally, the defendant told Billings and Nicgorski that the victim was still breathing, bleeding, and moaning.

During the next four days, the defendant, Nicgorski, and Billings stayed in the defendant's room. On May 24, 1984, Billings and the defendant were in the defendant's room with Nicgorski and his girl friend. The defendant told Nicgorski to unlock his room and bring his car around so they could "get rid of the garbage." The two women stayed in the defendant's room and heard the sounds of bottles falling and various thumping noises. Shortly thereafter, the two men returned and the defendant instructed the women to clean the hallway and Nicgorski's room. As the women wiped the hallway floor, they noticed a dark red colored liquid outside Nicgorski's door and they detected a foul odor like "spoiled meat" in the hall.[6]

---

[5] The gun was never found.

[6] Billings went into Nicgorski's room to clean it, but left the room without cleaning it because of the terrible odor. The defendant's landlord also stated that the entire top floor of the rooming house smelled like "rotten hamburger."

The landlord had evicted the defendant for nonpayment of rent four days after the victim's body was discovered. The landlord removed the defendant's belongings in trash bags and stored them in his attic. Billings's pocketbook was in the defendant's room when the landlord was gathering the defendant's belongings. The landlord looked through the pocketbook. The landlord saw a bullet in the pocketbook.

This bullet was subsequently compared with the bullet that was removed from the victim's skull. Both bullets were .38 caliber. There was testimony that the bullet which killed the victim could have been fired from a .38 caliber revolver.

The defendant filed a motion to suppress these items. After hearing, the judge made findings of fact and denied the motion. On appeal, the defendant

The two men returned approximately fifteen to twenty min-
tues later. The four of them then went out for coffee. When
Nicgorski's girl friend was dropped off at her home, the defend-
ant told her that she would be in trouble if she told anyone
what had happened. The next day the body of the victim was
discovered.

Billings identified the victim's body, but initially she did
not tell the police about the murder. On June 1, 1984, Billings
told the police about the defendant's role in the murder. Search
warrants were obtained and executed for the defendant's and
Nicgorski's rooms, the attic of the rooming house, and Nic-
gorski's automobile.

In the hallway and in Nicgorski's room, human blood, the
same blood group as the victim's, was discovered.[7] Blood and
human flesh were found in Nicgorski's car. In the attic, in the
bags containing the defendant's belongings, the police found
Billings's pocketbook. Inside the pocketbook, the police recov-
ered an unfired .38 caliber bullet. On June 2, 1984, the defend-
ant was arrested.

The defendant claims error in the denial of his motion to
exclude evidence of his criminal convictions. At the close of
the Commonwealth's case, the defendant asked the judge "the
extent that [he] would allow the Government to use" evidence
of the defendant's criminal record to impeach the defendant's
credibility should he decide to testify. The Commonwealth
informed the judge that, if it were permitted, it would use the
prior convictions of manslaughter, breaking and entering, re-
ceiving stolen property, escape, armed robbery while masked,
and possession of burglarious implements to impeach the de-

has not argued any error with respect to that ruling. Therefore, it is deemed
waived. See *Commonwealth* v. *Cundriff,* 382 Mass. 137, 150-151 n.22
(1980), cert. denied, 451 U.S. 973 (1981). See also Mass. R. A. P. 16(a)(4),
as amended, 367 Mass. 919 (1975). Pursuant to G. L. c. 278, § 33E, we
have reviewed the findings and the ruling and conclude that the findings
are supported by the evidence. Although the warrant itself is not before us,
on the basis of what is before us, there is no error.

[7] No blood was found in the defendant's room. The landlord stated that
he had scrubbed and disinfected the defendant's room after his eviction.

fendant's credibility.[8] The defendant argued at trial that the armed robbery conviction would be particularly prejudicial in light of Billings's testimony that the defendant was planning on making a "score" at the dog races. The judge indicated that the decision to admit evidence of criminal convictions was one of discretion and that he needed time to decide the issue. Shortly thereafter, the judge ruled that he would permit the Commonwealth to introduce evidence of prior convictions which qualify under G. L. c. 233, § 21. The defendant objected to the judge's ruling and stated that the defendant was planning to take the stand only if this impeachment evidence were excluded.

One witness testified on behalf of the defendant. This witness, the victim's fiancée, testified that she and the victim had had a terrible argument, as a result of which she asked the victim to leave her home. The witness stated that she threatened the victim and told him she would like to have someone beat him up. At the conclusion of this testimony, the defense rested its case and made an offer of proof as to the substance of the defendant's testimony had he taken the stand. The defendant would have testified that he did not shoot the victim, but that Nicgorski shot the victim, after the victim had pulled a knife and threatened Nicgorski. In the defendant's offer of proof, he did not deny his later participation in concealing the homicide.

1. *The use of the prior convictions.* The use of evidence of prior criminal convictions to impeach the credibility of a witness, including the defendant, is specifically authorized by G. L. c. 233, § 21, and does not infringe on the Federal or State constitutional rights of a defendant.[9] *Spencer* v. *Texas,* 385

---

[8] The defendant's record of criminal convictions was extensive. The Commonwealth did not seek to introduce evidence of the defendant's entire criminal record. Some of the convictions would not have been admissible because the record of conviction did not indicate whether the defendant was represented by counsel. *Commonwealth* v. *Cook,* 371 Mass. 832, 833 (1977). Some were motor vehicle offenses.

[9] We assume, without deciding, that the defendant has properly preserved this issue for review. In *Luce* v. *United States,* 469 U.S. 38, 43 (1984),

U.S. 554, 560-561 (1967). *Commonwealth* v. *Diaz,* 383 Mass. 73, 79 (1981). *Commonwealth* v. *Gonzalez,* 22 Mass. App. Ct. 274, 276 (1986). The decision whether to admit evidence of prior convictions to impeach a witness involves an exercise of discretion by the judge. *Commonwealth* v. *Knight,* 392 Mass. 192, 194 (1984).[10] The judge must balance the danger of unfair prejudice which can result from the admission of evidence of prior convictions against the probative value of the evidence for the purpose of impeachment. *Commonwealth* v. *Maguire,* 392 Mass. 466, 470 (1984). This exercise of discretion is reviewable on appeal.[11] *Id.* See P.J. Liacos, Massachusetts Evidence 149 (5th ed. 1981 & 1985 Supp.).

"The rationale for impeachment by prior conviction lies in the fact that the defendant's past conduct may have a tendency to demonstrate present untruthfulness; that is, a defendant's

the Supreme Court held that to preserve for review a claim of improper impeachment with a prior criminal conviction, a defendant must testify. We are, of course, free to set a higher standard than the Supreme Court standard in *Luce. Commonwealth* v. *Upton,* 394 Mass. 363 (1985).

In *Commonwealth* v. *Diaz,* 383 Mass. 73, 81 (1981), we indicated that a ruling on a defense motion to bar impeachment through prior convictions should be made as early as possible, as it will affect the course of the trial. Moreover, we encouraged judges to prepare for this early ruling by inquiring about the nature of the proof the parties intend to present. Here, it would have been better practice to have inquired as to the substance of the defendant's testimony prior to ruling on the motion. See *Gonzalez, supra* at 280. Nevertheless, at the time the judge made his ruling, the defense strategy was evident from the cross-examination of the Commonwealth's witnesses.

[10] For the evolution of this judicial discretion, see, e.g., *Commonwealth* v. *West,* 357 Mass. 245, 249 (1970) (court ruled that judge did not have discretion to exclude evidence of a conviction if it fit within the statutory requirements); *Commonwealth* v. *Chase,* 372 Mass. 736, 750 (1977) (court stated that it would not deny any judge the right to avoid unfairness, if prejudice to the defendant as a result of evidence of prior convictions were intense); *Commonwealth* v. *Maguire,* 392 Mass. 466, 470 (1984) (judge has discretion in admitting evidence of prior convictions which is reviewable on appeal).

[11] We have found reversible error if a judge fails to realize and exercise his discretion in deciding whether to admit evidence of prior convictions. *Commonwealth* v. *Guilfoyle,* 396 Mass. 1003, 1004 (1985). Moreover, admission of evidence of prior convictions solely *because* of the similarity of the conviction to the crime being tried is reversible error. *Guilfoyle, supra. Commonwealth* v. *Roucoulet,* 22 Mass. App. Ct. 603, 608 (1986).

earlier disregard for the law may suggest to the fact finder similar disregard for the courtroom oath." *Commonwealth* v. *Roucoulet,* 22 Mass. App. Ct. 603, 608 (1986). See *Commonwealth* v. *Elliot,* 393 Mass. 824, 834 (1985) (Lynch, J., concurring). Nevertheless, we have recognized a danger that unfair and improper inferences may be drawn by the fact finder if a prior conviction is substantially similar to the crime being tried. *Maguire, supra* at 469. *Diaz, supra* at 78. The admission of evidence of prior convictions presents the risk that the fact finder's attention may be diverted from the question of the defendant's guilt to the question of the defendant's bad character. *Maguire, supra.* "It is firmly and wisely established in our law that no defendant should be convicted of a crime by proof of his reputation or propensity to commit similar crimes." *Commonwealth* v. *DiMarzo,* 364 Mass. 669, 681 (1974) (Hennessey, J., concurring).

The defendant here did not request at trial that the convictions which were substantially similar to the crime for which he was being tried be excluded. Instead, he asked that all his prior convictions be excluded. The judge stated that the decision as to whether this evidence would be admitted was one of discretion. He took the matter under advisement and thereafter exercised his discretion by ruling that the particular prior convictions offered by the Commonwealth were admissible. The judge further informed the defendant that, if he were impeached with the prior convictions, the judge would instruct the jury immediately after the admission of this evidence that it was relevant only on the issue of the defendant's credibility. See *Maguire, supra* at 470. There was no abuse of discretion.

The defendant was on trial for murder in the first degree. His defense was that the Commonwealth failed to prove his guilt beyond a reasonable doubt.[12] The defendant's other de-

---

[12] Billings was impeached by cross-examination indicating that she did not tell the police of the murder when she initially identified the body. Moreover, she was impeached by the different versions of the events which she had told the police during the investigation. Finally, defense counsel brought out Billings's potential bias as she could have been indicted as an accessory after the fact.

fense theory was that Nicgorski was the culprit. That testimony, however, would not have absolved the defendant of guilt. The testimony might have provided grounds for the defendant's culpability on the basis of joint venture or, at a minimum, culpability as an accessory after the fact to murder. The judge's ruling therefore would have affected the defendant's credibility, but it did not affect the primary defense strategy brought out through cross-examination, that the Commonwealth had not proved its case beyond a reasonable doubt, or that Nicgorski was the person who committed the crime. Nor did it prevent the defendant from offering evidence that others had a motive to harm the victim.

We also note that this crime does not bear a substantial similarity to the defendant's prior convictions. The defendant argued at trial that the armed robbery conviction was similar to the evidence that the defendant intended to make a "score" at the dog races. Yet there was no evidence that the defendant committed any crime while at the races. In addition, there was no evidence as to what was meant by "score." Moreover, the defendant was not tried for robbery. The first-degree murder conviction was predicated solely on deliberate premeditation. There were no instructions concerning felony-murder as a basis for murder in the first degree.

The defendant contended at oral argument, but not in his brief, that the manslaughter conviction was similar to the murder charge and therefore it was particularly prejudicial. The Commonwealth stated at trial that it would impeach the defendant with his plea of guilty to the crime of manslaughter. The original charge of murder would not have been revealed to the jury. We have not said that admission of a similar conviction is per se error. Rather, we have said that, even if the criminal convictions were similar to the crime for which the defendant is being tried, the judge must balance the probative value and the prejudicial effect to determine whether to admit the evidence. See *Maguire, supra* at 471 (no error in the admission of prior conviction of lewd and lascivious behavior where the defendant was on trial for assault with intent to commit rape and aggravated rape). The judge did that in this case. Moreover,

the judge made it clear that he would have given careful instructions both at the time the evidence came in and during the general charge to the jury.[13] Because the judge carefully considered the defendant's arguments, we conclude that there was no error in the judge's ruling admitting evidence of the defendant's prior convictions to impeach the defendant.

2. *The evidence of voluntary intoxication.* The defendant also argues that the judge erred in failing to instruct the jury on the effect of voluntary intoxication. The defendant filed a request for an instruction concerning voluntary intoxication.[14] But, when the judge omitted any instruction on intoxication, the defendant failed to object to his omission.[15] It was appro-

---

[13] We also note that given the Commonwealth's proof that the defendant had devised a plan to murder the victim, stated his intentions on several occasions, and then carried out this plan, the murder charge was not similar to the prior manslaughter conviction. This element of deliberate planning is absent from the crime of manslaughter.

[14] The requested instruction on voluntary intoxication was as follows: "Although intoxication or drunkenness alone will never provide a legal excuse for the commission of a crime, the fact that a person may have been intoxicated at the time of the commission of a crime may negate the existence of a specific intent. So, evidence that the defendant acted while in a state of intoxication is to be considered in determining whether or not he acted with specific intent as charged. If the evidence in the case leaves you with a reasonable doubt whether, because of the degree of his intoxication, the mind of the defendant was capable of forming, or did form, specific intent to commit the crimes charged, you should find him not guilty." At trial, defense counsel conceded that the request did "not exactly state the law of the Commonwealth as it is." The Commonwealth objected to this request.

On appeal, the defendant asserts that after our decision in *Commonwealth* v. *Grey,* 399 Mass. 469, 470 (1987), this instruction comports with the law of this Commonwealth. There is no merit to this contention. The *Grey* decision does *not* state that if the jury finds that voluntary intoxication affected the defendant's capacity to form the necessary specific intent to commit the crime, the jury should find the defendant not guilty. In *Grey,* we stated only that the jury should be permitted to decide if some mental condition rendered the defendant unable to form the specific intent necessary for the crime of murder, but that finding would not exonerate the defendant from guilt for a crime requiring only general intent. *Id.* at 474.

[15] Appellate counsel for the defendant was not trial counsel. On appeal, the defendant contends that the failure to object to this omission constitutes ineffective assistance of counsel. In *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974), we stated that the standard of review in assessing claims of this sort is "whether there has been serious incompetency, inefficiency, or

priate for the judge to refuse to give the requested instruction because it was incorrect as a matter of law. See *supra,* note 14. Therefore, the issues are whether there was enough evidence of intoxication to require the judge, sua sponte, to instruct the jury on the effect of voluntary intoxication and whether the failure to instruct on voluntary intoxication resulted in a substantial likelihood of a miscarriage of justice. G. L. c. 278, § 33E.

A primary difficulty with the defendant's claim is that the defense was not one of intoxication. The defendant did not rely on intoxication as a mitigating factor at any point in the trial. At the time the defendant sought to exclude all his prior convictions, he set forth his defense theories, which were that Nicgorski did the shooting; the Commonwealth had not proved its case beyond a reasonable doubt; and that others also had a motive to harm the victim. He did not suggest or even intimate that, as a result of his drinking, he was incapable of forming the requisite specific intent. Thus, there was no notice to the judge at any point that intoxication or the defendant's mental capacity was an issue. The theory on which a case is tried below cannot be changed on appeal. See *Commonwealth* v. *Marchionda,* 385 Mass. 238, 242 (1982); *Commonwealth* v. *Lewis,* 346 Mass. 373, 383 (1963), cert. denied, 376 U.S. 933 (1964). See also *Commonwealth* v. *Henson,* 394 Mass. 584, 593 (1985); *Commonwealth* v. *Gil,* 393 Mass. 204, 221 (1984); *Commonwealth* v. *Chasson,* 383 Mass. 183, 188 n.1 (1981).

Pursuant to G. L. c. 278, § 33E, we turn to whether there is a substantial likelihood of a miscarriage of justice from the

inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." Whether counsel simply failed to notice the omission or had decided not to pursue this claim, given the lack of evidence of intoxication, the failure to object does not constitute ineffective assistance of counsel. Moreover, because the requested instruction was incorrect as a matter of law, the failure to object did not deprive the defendant of any substantial ground of defense.

absence of an intoxication instruction. The evidence of intoxi-
cation was minimal. The evidence of intoxication was intro-
duced through the cross-examination of Billings. She stated
that the men had consumed "quite a bit" of beer. She did not
know, however, if the defendant was intoxicated. There was
no evidence concerning the amount of beer purchased or con-
sumed by any of the men.[16] The conduct of the defendant on
the night of the murder without other evidence does not support
the defendant's claim made on appeal that he was so drunk
that he was not able to form the intent needed for deliberately
premeditated malice aforethought. The day before the murder,
in a conversation concerning Billings's living situation, the
defendant stated that he would "take care of business." Im-
mediately before the murder, as he was loading the gun, the
defendant repeated that he was going to "take care of business."
Moreover, there was no evidence that the defendant had any
difficulty walking, speaking, locating the gun, or loading the
gun. Immediately following the shooting, the defendant in-
formed Billings that he had "taken care of business" and that
he would have to get rid of the evidence of the crime, including
the gun and the body of the victim. The defendant had no
difficulty stealing the money or dividing the money. Finally,
the defendant told Nicgorski to lock the door to his room so
that the victim's body would not be discovered. In the absence
of evidence of intoxication and its effect on the defendant,
there can be no claim of debilitating mental impairment due
to intoxication. See *Gil, supra* at 221; *Commonwealth* v. *Costa,*
360 Mass. 177, 183 (1971). Contrast *Commonwealth* v. *King,*
374 Mass. 501, 507 (1978). Because there was insufficient
evidence of intoxication and lack of mental capacity to require
the judge, sua sponte, to instruct on the effect of voluntary
intoxication, there was no error, much less a substantial likeli-
hood of a miscarriage of justice, because the judge did not

---

[16] The victim's blood alcohol level was .12. While the pathologist opined
that this level was "fairly close" to what the victim's blood alcohol level
was at the time of his death, he also stated that the decomposition process
may increase or decrease the blood alcohol level.

instruct on this issue.[17] See *Commonwealth* v. *Stewart,* 398 Mass. 535, 546 (1986).

Finally, under G. L. c. 278, § 33E, we have considered whether there was sufficient evidence of voluntary intoxication to warrant the reduction of the degree of guilt from murder in the first degree to murder in the second degree. See *Commonwealth* v. *Perry,* 385 Mass. 639, 649 (1982). We conclude that there is insufficient evidence of intoxication to warrant the reduction to murder in the second degree. In addition, we have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and conclude that there is no reason to exercise our power to order the entry of a lesser degree of guilt or a new trial.

*Judgment affirmed.*

---

[17] This case does not present the issue we addressed in *Commonwealth* v. *Grey,* 399 Mass. 469, 470 (1987). In *Grey,* the judge erred in instructing the jury that it could not consider evidence of the defendant's mental condition in deciding whether the defendant had the specific intent to kill. Further, the mental capacity was an issue throughout the *Grey* trial. Here, the judge did not instruct the jury that it could not consider evidence of alcohol. The judge made no mention of the fact in his charge. Moreover, the defendant's mental capacity was not an issue at the trial and, as already mentioned, there was minimal evidence of intoxication.